# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Crim. No. 14-375 (SRN/JJK)

        Plaintiff,

v.                                                **REPORT AND**
                                                  **RECOMMENDATION**

Nathan Neal Dorweiler,

        Defendant.

Laura M. Provinzino, Esq., Assistant United States Attorney, counsel for plaintiff.

Manny K. Atwal, Esq., Office of the Federal Defender, counsel for defendant.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

The defendant in this case, Nathan Neal Dorweiler, is charged with possession, distribution, and receipt of child pornography in violation of 18 U.S.C. § 2252.  During the investigation of these offenses, state law enforcement officers applied for and obtained a search warrant for Dorweiler's home.  When several officers executed the warrant on September 13, 2013, Faribault Police Department Detective Brandon Gliem interviewed Dorweiler in a laundry room at the residence, and Dorweiler made certain incriminating statements during the interview.  After that interview, Dorweiler was arrested and taken into custody.  Over a year later, a federal grand jury indicted Dorweiler on the charges he faces in this case.  After Dorweiler's indictment, on November 21, 2014, Officer Dale

Hanson of the Minneapolis Police Department went to the Rice County Jail where Dorweiler was being held to transport Dorweiler to the United States Marshals for custody.  When Hanson was escorting Dorweiler to a vehicle for transport, Dorweiler made another incriminating statement.

Dorweiler now moves to suppress the statement he made to Officer Hanson at the Rice County Jail on November 21, 2014, and the statements he made to Detective Gliem at his home on September 13, 2013.  (Doc. No. 22.)  He also brings a motion to suppress the evidence seized pursuant to the search warrant executed at his residence on September 13, 2013.  (Doc. No. 23.)  The Court held a hearing on these motions on January 13, 2015.  Both Officer Hanson and Detective Gliem testified at the hearing, and the Court received audio recordings and an application for the search warrant into evidence.  Pursuant to 28 U.S.C. § 636 and Local Rule 72.1, and for the reasons that follow, the Court recommends that Dorweiler's motions be denied.

## FINDINGS OF FACT

### I.      September 12, 2013 Interview at Dorweiler's Residence

Detective Gliem learned that a task force agent in the Minneapolis Police Department obtained information in response to a subpoena seeking information about internet activity at a Faribault residence.  (Doc. No. 33, 1/13/2015 Hr'g Tr. ("Tr.") 6:5-19.)  The task force agent suspected that child pornography was being downloaded to and possibly transmitted from a computer located at the Faribault residence.  (Tr. 6:13-19.)  Dorweiler had been identified as a potential suspect in

2

the receipt of child pornography in this investigation because he was residing at the residence and was a registered predatory offender.  (Tr. 8:5-12.)  Based on the information Detective Gliem received, he applied for and obtained a search warrant for the Faribault residence to determine whether there was child pornography located at the home and who may have downloaded or received it. (Tr. 6:20-8:2; Gov't's Ex. 1, 9/11/13 Search Warrant.)

On September 12, 2013, Detective Gliem and four other officers went to the Faribault residence to execute the search warrant.  (Tr. 8:23-9:10 (date); *id.* at 15:17-23 (number of officers).)  The officers executing the warrant wore ballistic vests identifying themselves as police officers, and they were all armed. (Tr. 22:12-20.)  One or more of them may have drawn their weapons when they arrived at the home and were in the process of clearing the residence prior to conducting their search.  (Tr. 14:6-20.)  When they arrived at the Faribault residence around 9:00 in the morning, some of the officers encountered Dorweiler in his bedroom and may have had their guns drawn when they removed him from the bedroom.  (Tr. 23:6-15.)

Dorweiler was sitting in a chair in the living room when Detective Gliem brought Dorweiler to another room to speak with him.  (Tr. 23:21-25.) Approximately ten to fifteen minutes after the officers began executing the search warrant Detective Gliem interviewed Dorweiler in a mudroom or laundry room adjoining the kitchen.  (Tr. 10:12-16, 11:7-10.)  This laundry room was a "small room" that held a washer, dryer, and a freezer.  (Tr. 24:18-22.)  Detective Gliem

3

asked Dorweiler if he was comfortable with the door to the laundry room being shut for "privacy reasons," and Dorweiler said that shutting the door was "fine." (Tr. 17:6-12.)  Thus, the door to the laundry room was partially shut during the interview.  (Tr. 17:2-5.)  Detective Gliem sat between Dorweiler and the door. (Tr. 17:2-5.)  Detective Gliem began speaking with Dorweiler, and after a brief period, he read Dorweiler a *Miranda* warning.  (Tr. 12:14-22.)

The interview lasted approximately forty minutes.  Detective Gliem did not yell at Dorweiler during the interview.  He did not threaten Dorweiler.  And he made no false promises to Dorweiler.  (Tr. 13:1-17.)  Detective Gliem recorded the interview.  (Gov't's Hr'g Ex. 2, CD Audio Recording of 9/12/2013 Interview ("9/13/2013 Recording").)  Dorweiler was not handcuffed during the interview. (Tr. 10:24-11:1.)  Detective Gliem did not have his weapon drawn at any point during the interview.  (Tr. 14:21-25.)  Detective Gliem was not concerned during the interview that Dorweiler was intoxicated.  (Tr. 12:17-22.)  He believed Dorweiler could understand what was going on, that he could understand his surroundings, and that he was capable of providing a "good" statement.  (*Id.*) When Dorweiler asked to get a glass of water and to be able to use an electric cigarette during the interview, the officers accommodated his request. (Tr. 11:13-25, 13:18-25.)  However, Detective Gliem did not allow Dorweiler to go get these items himself because he did not want Dorweiler to wander around the house while the officers were searching for items pursuant to the search warrant. (Tr. 20:12-21:7.)

4

While Detective Gliem was interviewing Dorweiler, Dorweiler's mother and father were in the house, but they were not in the laundry room.  (Tr. 16:12-19.) Detective Gliem did not believe that they could hear the conversation that he was having with Dorweiler because the door to the laundry room was shut. (Tr. 16:20-17:1.)  Detective Gliem had spoken with Dorweiler's mother before he spoke with Dorweiler in the laundry room.  (Tr. 24:4-11.)  Detective Gliem had first encountered Dorweiler's father outside the home, and he told Dorweiler during the interview that Dorweiler's father was "pretty upset."  (Tr. 24:12-14.)

Dorweiler never invoked his right to remain silent during the interview, and he did not ask to speak to an attorney.  (Tr. 17:16-21.)  When the interview concluded, based on Dorweiler's statements and Detective Gliem's consultation with other investigators at Dorweiler's residence about the items they found during the search, Detective Gliem decided to place Dorweiler under arrest for possession of child pornography.  (Tr. 18:6-24.)  Dorweiler was cooperative when he was placed under arrest.  (Tr. 18:25-19:1.)

## II.     November 21, 2014 Statements at Rice County Jail and In Transport

Minneapolis Police Officer Dale Hanson, who is also a member of a joint task force investigating child exploitation offense with the Federal Bureau of Investigations, is the case agent responsible for the investigation in this case. (Tr. 26:6-19.)  As the case agent, Officer Hanson obtained an arrest warrant for Dorweiler after the federal grand jury returned an indictment.  (Tr. 27:3-12, 28:6-10.)  On November 21, 2014, he went to the Rice County Jail to transport

Dorweiler from the jail to the U.S. Marshal's custody at the federal courthouse located in St. Paul.  (Tr. 28:6-14.)  Between Dorweiler's arrest in September 2013 and his arrest on federal charges in November 2014, Dorweiler had been charged in state court, bailed out pending his state case, and then rearrested by Faribault Police when Officer Hanson obtained the federal arrest warrant. (Tr. 35:4-24.)

Officer Hanson first encountered Dorweiler in the Rice County Jail at a desk near an elevator.  (Tr. 28:15-21.)  When Dorweiler was escorted to meet with Officer Hanson, Officer Hanson introduced himself and an FBI agent named Kukura.  (Tr. 28:22-25.)  After Officer Hanson introduced himself, and while Officer Hanson was completing paperwork for the transfer of custody, Dorweiler asked him what the charges against him were.  (Tr. 28:25-29:1, 29:9-13.)  Officer Hanson told Dorweiler that he had been charged with distribution and possession of child pornography.  (Tr. 29:11-15.)  Dorweiler appeared shocked at the distribution charge and told Officer Hanson that he "wasn't distributing, he was just downloading."  (Tr. 29:15-17.)  Dorweiler asked Officer Hanson what qualified his conduct as distribution, and Officer Hanson told him that it was the software that Dorweiler had used.  (Tr. 30:6-11.)  This portion of the encounter between Officer Hanson and Dorweiler was not recorded.  (Tr. 29:2-8.)  No one provided Dorweiler any *Miranda* warnings at the time of this encounter.  (Tr. 38:5-6.)

During this initial encounter, Officer Hanson did not threaten Dorweiler. (Tr. 29:34-30:1.)  Nor did he brandish a weapon or make any false promises to Dorweiler.  (Tr. 30:2-5.)  At some point before Officer Hanson and Agent Kukura brought Dorweiler down to the car, they put him in handcuffs (Tr. 36:7-11), but the record does not establish whether Dorweiler was restrained in any way when he engaged in a conversation with Officer Hanson about the distribution charge.

Once Officer Hanson completed the paperwork for transferring Dorweiler to the custody of the U.S. Marshals, which took about two or three minutes, he and Agent Kukura escorted Dorweiler to their vehicle.  (Tr. 29:18-23, 36:22-24.) When they arrived at the vehicle, the officers secured Dorweiler in the back seat of the vehicle, and Officer Hanson activated a recorder once he occupied the front seat of the vehicle.  (Tr. 30:12-17.)

Officer Hanson did not intend to interview Dorweiler that day because it did not seem necessary for the case.  (Tr. 30:18-22.)  He told Dorweiler that it was not his intention to question him during transport, but he also told Dorweiler that he would have a conversation with Dorweiler if he wanted to talk.  (Tr. 31:4-9.) Just as Officer Hanson was about to read Dorweiler his *Miranda* rights in the vehicle, Dorweiler "basically . . . took over and recited three of the four lines of the *Miranda* warning by himself."  (Tr. 31:10-13.)  Officer Hanson completed the *Miranda* advisory by providing the last of the rights that Dorweiler had not recited. (Tr. 31:14-17.)  During the transport, which lasted about forty-five minutes to an hour, Officer Hanson and Dorweiler engaged in a two-sided conversation in

7

which both of them were asking and answering each other's questions.

(Tr. 32:10-16, 33:18-20.)  Dorweiler never invoked his right to counsel or his right

to remain silent at any point during the transport.  (Tr. 34:9-18.)

## CONCLUSIONS OF LAW

### I.    Motion to Suppress Statements

#### A.    September 13, 2013 Statements at Dorweiler's Residence

Dorweiler raises two grounds in support of his motion to suppress He

argues that the government should be prohibited from using the statements he

made at his home on September 13, 2013, in its case in chief because they were

the product of a custodial interrogation and he did not voluntarily waive his

*Miranda* rights.  (Doc. No. 34, Def.'s Mem. in Supp. of Mot. to Suppress Evidence

Obtained as a Result of Search and Seizure & Statements ("Def.'s Mem.") 4-7.)

For a defendant's statements made during a custodial interrogation to be

admissible against him at trial during the government's case-in-chief, law

enforcement must provide a *Miranda* warning prior to questioning.  *Miranda v.*

*Arizona*, 384 U.S. 436 (1966).  The warning must inform a defendant that he has

the right to remain silent, that anything he does say can be used against him as

evidence, that he has a right to the presence of an attorney, and that if he cannot

afford an attorney one will be appointed for him.  *Miranda*, 384 U.S. at 444.

A custodial interrogation that triggers the need for *Miranda* warnings is one

that "involves questioning initiated by law enforcement officers after a person has

been taken into custody or otherwise deprived of his freedom of action in any

8

significant way." *Miranda*, 384 U.S. at 444.  The Eighth Circuit has identified several non-exclusive factors for courts to consider when determining whether an individual is in custody.  *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (listing six non-exclusive factors relevant to the custody analysis); *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest").  *Miranda* warnings are only required for statements to be admissible when those statements are made in response to interrogation, which consists of direct questioning or its functional equivalent.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Even if a defendant makes statements to law enforcement while he is in custody and subject to interrogation, the government may use those statements against him at trial if law enforcement officers advise the defendant of his *Miranda* rights and the defendant makes a voluntary, knowing, and intelligent waiver of those rights.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  It is the government's burden to show by a preponderance of the evidence that the defendant's waiver meets these standards.  *Miranda v. Arizona*, 384 U.S. 436, 473 (1966).  Whether a waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances.  *Moran*, 475 U.S. at 421.  To make a voluntary, knowing, and intelligent waiver, the defendant must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to

9

abandon it." *United States v. Syslo*, 303 F.3d 860, 865 (8th Cir. 2002). Courts look to such factors as the age and education level of the defendant, lack of advice as to constitutional rights, length of detention, "repeated and prolonged nature of questioning," and the use of physical punishment. *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988) (quoting *Hall v. Wolff*, 529 F.2d 1146, 1150-51 (8th Cir. 1976)).

There is no dispute that Dorweiler was interrogated at his residence because Detective Gliem directly questioned him during the encounter in the laundry room. Dorweiler points to several factors that he contends demonstrate he was in custody at the time of the encounter with Detective Gliem at his home. (Def.'s Mem. 6.) The government disputes that Dorweiler's interrogation at his home was custodial. (Doc. No. 36, Gov't's Resp. to Def's Mem. in Supp. of Mots. to Suppress ("Gov't's Resp.") 5 n.1.) But to resolve Dorweiler's motion, the Court need not decide whether Dorweiler was in custody. This is so because, even assuming for the sake of argument that Dorweiler was in custody during this interrogation, the Court concludes that Detective Gliem advised Dorweiler of his *Miranda* rights, and Dorweiler made a knowing, voluntary, and intelligent waiver of those rights.

Dorweiler was informed of his constitutional right to remain silent and to have an attorney present. He was told that he would have an attorney provided for him if he could not afford one. And he was told what the consequence would be if he chose to speak with Detective Gliem. In response, Dorweiler said that he

10

understood these rights and that he agreed to speak to Detective Gliem. (9/13/2013 Recording 3:10-3:45.)  He was not threatened or intimidated. Detective Gliem did not unreasonably prolong questioning him in the laundry room.  Officers on the scene provided Dorweiler water when he asked for it and gave him his e-cigarette when he requested it.  No officer used physical punishment as a means to extract Dorweiler's agreement to waive his rights and coerce him into speaking.  At the time of the September 13, 2013 interrogation, he was approximately forty years old, so he was neither so young nor so old that the Court might conclude he could not appreciate the consequences of choosing to speak to Detective Gliem.  And during the interview, there was no indication that Dorweiler was intoxicated.  Nor was there any reason for Detective Gliem to believe that Dorweiler did not fully understand his rights or the nature of the conversation.  Dorweiler never invoked his right to keep silent and never asked for counsel.  In other words, the evidence here demonstrates that Dorweiler's decision to talk to Detective Gliem was the product of a free and deliberate choice and not the result of intimidation, coercion, or deception.  *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ("A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.") (internal quotations omitted).

For these reasons, the Court concludes that Dorweiler's statements during the September 12, 2013 interview at his home need not be suppressed because he made a knowing, voluntary, and intelligent waiver of his *Miranda* rights.

**B.     November 21, 2014 Statements at Rice County Jail and in Transport**

Dorweiler argues that the Court should suppress the pre-warning statements he made to Officer Hanson at the Rice County Jail before he was escorted to the vehicle Hanson used to transport him to federal custody, as well as the statements he made in the vehicle after he was advised of his *Miranda* rights.  (Def.'s Mem. 7-9.)  He contends that the pre-warning statement he made must be suppressed because Officer Hanson unlawfully enticed him into speaking.  And the statements he made in the vehicle after he was warned of his *Miranda* rights must be suppressed as fruit of the poisonous tree.  (*Id.* 8-9.)  The government contends that Dorweiler's pre-warning statement to law enforcement was not unlawfully enticed because Dorweiler initiated the conversation by asking what the charges were against him, and there was no reason that Officer Hanson should have known that answering him by informing him of the charges would elicit an incriminating response.  (Gov't's Resp. 7.)  Further, the government argues that Dorweiler's post-warning statements in the vehicle during transport should not be suppressed because Dorweiler made a voluntary, knowing, and intelligent waiver of his rights.  (*Id.* at 5-9.)

The Court need not suppress the statement Dorweiler made at the jail before he received *Miranda* warnings if Dorweiler was not subjected to

interrogation.[1]  A suspect is "interrogated" for purposes of a *Miranda* analysis

when law enforcement officers engage in direct questioning of the suspect or its

functional equivalent by using words or actions that are reasonably likely to elicit

an incriminating response.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980);

*United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014)

("Interrogation in the *Miranda* context refers to express questioning and to words

or conduct that officers should know is reasonably likely to elicit an incriminating

response from the suspect.") (quotations omitted).  Here, there is no dispute that

Officer Hanson did not question Dorweiler directly when they had their initial

encounter.  Thus, the issue in this case is whether Officer Hanson used words or

conduct reasonably likely to elicit an incriminating response.

The Court concludes that Officer Hanson did not engage in the functional

equivalent of questioning.  When Officer Hanson told Dorweiler that he had been

charged with possession and distribution of child pornography, he was merely

responding to Dorweiler's question about what the federal charges against him

were.  Such a response to a defendant's question does not amount to

interrogation.  *See Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) ("We

have also held that an officer's response to a defendant's question does not

amount to interrogation.").  The same is true of Officer Hanson's response to

---

[1]      There is no dispute that Dorweiler was in custody at this time.  There is
also no dispute that *Miranda* warnings were not provided until after the initial
encounter when Officer Hanson and Agent Kukura placed Dorweiler in the
vehicle in which they transported Dorweiler to the courthouse in St. Paul.

Dorweiler's pre-warning question about why his conduct qualified as distribution of child pornography.  *See United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008) (stating that an officer's response explanation that the police were in the area because they were responding to complaints about gang activity and shots being fired would not amount to interrogation if in response to the defendant's question).

Moreover, there was no evidence that Officer Hanson had any knowledge that Dorweiler would be unusually susceptible to implicating himself in criminal activity merely by being informed of the nature of the charges against him or having Officer Hanson answer Dorweiler's question about the basis for the distribution charge.  *See Innis*, 446 U.S. at 302 n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.").  Nor was Officer Hanson engaged in any "lengthy harangue in the presence of the suspect" when Dorweiler made the pre-warning statements at issue.  *Id.* at 303.

Because Dorweiler volunteered information at the time he made his pre-warning statements at the Rice County Jail and was not subjected to interrogation, there are no legal grounds to suppress the statements he made at that time.  Dorweiler argues that the statements he made in the law enforcement vehicle while being transported to the St. Paul courthouse should be suppressed

14

solely on the basis that the constituted fruits of the allegedly tainted pre-warning statements he made inside the jail.  Because this Court has concluded that that the statements Dorweiler made during the initial encounter were voluntary and validly obtained by Officer Hanson, Dorweiler's fruit-of-the-poisonous-tree argument has no application, and his motion to suppress the post-warning statements should be denied.[2]

For all these reasons, the Court recommends that Dorweiler's motion to suppress statements be denied.

## II.   Motion to Suppress Evidence Seized Pursuant to Search Warrant

Dorweiler moves to suppress evidence seized pursuant to the search warrant executed at his residence on September 12, 2013.  (Doc. No. 23.) Dorweiler has asked the Court to review the application for the search warrant to

---

[2]   This Court would also conclude that Dorweiler was adequately informed of his *Miranda* warnings and that he made the statements at issue after a knowing, voluntary, and intelligent waiver of those rights.  Dorweiler had a full understanding of his *Miranda* rights.  He recited three of the four rights himself, and Officer Hanson made certain that he was aware of the fourth.  Thereafter, Dorweiler engaged in a discussion with Officer Hanson in the vehicle after Hanson informed him that he had no intention to interview him, but said they could talk if Dorweiler wanted to have a discussion.  Dorweiler asked questions during the discussion in the vehicle.  He was given water to drink.  The discussion was not unreasonably prolonged.  There were no threats or use of physical punishment to get Dorweiler to waive his rights.  The officers did not raise their voices or otherwise engage in any conduct that could make Dorweiler's decision to speak with them anything other than the product of a free and deliberate choice.   Thus, even if Dorweiler could be said to have raised any argument in support of his motion to suppress these post-warning statements other than the fruit-of-the-poisonous-tree argument, his motion should still be denied.

determine whether there was probable cause for the search warrant to issue. (Doc. No. 23 at 1; Def.'s Mem. 9.)   The government contends that the application for the search warrant provided adequate probable cause to support the signing judge's decision to issue the search warrant and, even if the information in the application were insufficient to establish probable cause, the reliance on the search warrant was reasonable because it was not so facially lacking in probable cause that the executing officers could not, in good faith, rely on it.  (Doc. No. 24, Gov't's Pre-Hr'g Resp. 9-12.)

In determining if probable cause exists to support the issuance of a warrant, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination."  *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (citation omitted).  Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable.  *United State v. Chroback*, 289 F.3d 1043, 1046 (8th Cir. 2002). "The source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence."  *Id.* (quotations omitted).  Even if a search warrant lacks probable cause, evidence seized pursuant to a search warrant is admissible if it was objectively reasonable for the officers executing the search warrant to have relied in good faith on the validity of the search warrant.

16

*United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).

Having reviewed the affidavit submitted in support of the search warrant application and the statements provided by Detective Gliem, and considering the information in the affidavit as a whole, the Court concludes that there was ample probable cause. Detective Gliem described how Officer Hanson used undercover investigative software to learn that an individual had downloaded known child pornography files using peer-to-peer software on a computer linked to an IP address at a home in Faribault. Officer Hanson used a subpoena to an internet service provider to learn the identity of the subscriber associated with the IP address, then made contact with Dorweiler's mother, and learned that Dorweiler, a registered sex offender, resided at the home associated with the IP address. In his affidavit, Detective Gliem explained how, in his experience as an investigator, those who traffic in child pornography will keep explicit images for long periods of time and store them on various forms of digital media. Detective Gliem explained how he learned that Dorweiler, who had been staying with a brother, had returned to the Faribault residence and that he observed Dorweiler's vehicle in the driveway on September 11, 2013, the same day that he applied for the search warrant. Based on the information in the affidavit, and taking into account the great deference shown to the issuing judge's probable cause determination, this Court concludes that there was adequate probable cause to support the issuance of the search warrant at issue in this case.

For this reason, Dorweiler's motion to suppress evidence obtained as a result of search and seizure should be denied.

## RECOMMENDATION

Based on the foregoing, and on all the records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Dorweiler's Motion to Suppress Statements, Admissions and Answers (Doc. No. 22), be **DENIED**; and

2.      Dorweiler's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 23), be **DENIED**.


Date: February 9, 2015

 _s/ Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 23, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.